Alan CHAMISON, Plaintiff,

v.

HEALTHTRUST, INC.—The HOSPITAL COMPANY, Defendant.

C.A. No. 15904.

Court of Chancery of Delaware, New Castle County.

Submitted: May 15, 1998.

Decided: Jan. 12, 1999.

Modified and Reissued After Post–Trial Motion: June 30, 1999.

Stuart M. Grant, and Herbert W. Mondros, of Grant & Eisenhofer, P.A., Wilmington; of counsel: Scott S. Hershman, and Richard W. Barrett, of Bickel & Brewer, Dallas, Texas, for Plaintiff.

Wayne N. Elliott, and April Caso Ishak, of Prickett Jones Elliott & Kristol, Wilmington, for Defendant.

## OPINION

CHANDLER, Chancellor.

A director of a Delaware corporation was named a defendant in a derivative suit filed in a state court in Texas. The director was successful in the derivative action, obtaining a dismissal with prejudice. In doing so, however, he employed a Texas law firm that was not approved by the Delaware corporation, which had since merged with another Delaware corporation. The director brought this lawsuit to enforce his right to indemnification against the successor Delaware corporation.

This seemingly straightforward indemnification case resulted in a series of rulings on numerous pre-trial discovery disputes. It eventually was tried before this Court over two days in late April 1998. The Court considered testimony from six witnesses (three via deposition) and examined more than 175 trial exhibits. Based on the Court's assessment of the testimony and the documentary evidence, as well as the post-trial briefs, the Court concludes that the director is entitled to partial reimbursement of his attorney fees in connection with the Texas litigation and to all of his costs and fees incurred in prosecuting this enforcement action. The Court's findings of fact and conclusions of law are as follows.

## I. FACTUAL AND LEGAL HISTORY

In 1992, plaintiff Alan Chamison ("Chamison") was the Executive Vice President of American Medical Holdings, Inc. ("AMH"), a Delaware corporation and holding company for American Medical International, Inc. ("AMI"), also a Delaware corporation. Chamison was also the Chief Operating/Financial Officer of AMI. EPIC Holdings, Inc. ("EPIC") is a Delaware corporation that was spun off from AMI as an employee-owned entity. Although all of

EPIC's stock was originally held by an employee stock option plan ("ESOP"), AMI acquired close to 26% of EPIC's shares by exercising certain stock options contained in debt agreements. As EPIC's second largest stockholder, AMI had the right to designate one director to the five-member EPIC board. AMI selected Chamison to serve as its representative, and he was duly elected to the EPIC Board of Directors.

At the time of its formation, EPIC had awarded stock appreciation rights ("SARs") to certain key EPIC officers, as incentive bonuses for their efforts on behalf of EPIC.[1] In 1993, EPIC's Chief Executive Officer and Chairman of the EPIC Board, Kenn George ("CEO George"), began exploring the possibility of a SAR buyback through which the SAR-holders (CEO George and certain other directors) would sell back their SARs to EPIC. Chamison learned that the SAR buyback plan would not only be raised at a Board meeting on November 3, 1993, but voted on as well. Unable to secure from CEO George a promise not to vote on the issue until Chamison and other Board members had time to study the proposal, Chamison and AMI sought an injunction to prevent the Board from taking action. Alleging unfair price and breach of fiduciary duty, Chamison and AMI obtained a temporary restraining order forbidding action by the EPIC Board on the proposed SAR buyback.

Before the dispute over the SAR buyback proposal could be resolved, however, defendant HealthTrust, Inc.-The Hospital Company ("HealthTrust"), a Delaware corporation, and EPIC began to negotiate a business combination whereby Health-Trust would acquire EPIC as part of a reverse-triangular merger.[2] The EPIC–HealthTrust merger plan contained a SAR buyback provision not unlike what CEO George had been contemplating, but it also assured AMI and the other shareholders a substantial premium over the market price for their shares Chamison and the other EPIC Board members unanimously approved the merger.

A few days before the EPIC–HealthTrust merger's May 5, 1994 closing, an EPIC ESOP participant, Vicki Anderson, filed the derivative action at the center of this dispute. The *Anderson* suit alleged that the EPIC Board violated its fiduciary duty in approving a sale of EPIC at a reduced price in order to enjoy the SAR buyback. Along with the other Board members, Chamison, *though not a SAR-holder*, was named a defendant in the suit. After obtaining a preliminary injunction against the merger, the *Anderson* plaintiffs reached an agreement with EPIC and HealthTrust in which they retained standing to sue the survivor of the merger, and EPIC was allowed to merge with Health-Trust's wholly-owned subsidiary, Odyssey. Chamison and the other EPIC directors continued to serve on the EPIC Board until consummation of the merger on May 5, 1994. On that day, Odyssey ceased to exist, and EPIC became a wholly-owned subsidiary of HealthTrust, with a new board of directors.[3]

As part of the merger, both HealthTrust and EPIC agreed to indemnify "to the fullest extent permitted under [Delaware] law" the present and former directors of EPIC for all losses and costs, including reasonable attorney's fees, incurred in con-

---

1. SARs are a form of employee incentive compensation awarded to EPIC executives, operating much like phantom stock or stock options. The Court understands the record to show that the SARs' value was derived from the performance of EPIC's non-public stock, but is unsure what form of performance measure was used.

2. Under this agreement, a HealthTrust acquisition subsidiary called Odyssey Acquisition Corp. ("Odyssey") would be merged into EPIC, leaving EPIC as the surviving corporation and a wholly-owned subsidiary of Health-Trust. See Agreement and Plan of Merger (Jan. 9, 1994), DX 7 [hereinafter "HealthTrust Merger Agreement"].

3. HealthTrust Merger Agreement, § 1.01.

nection with any claims arising from their service as directors of EPIC.[4] This indemnification provision also stated that in the event of any such claim, HealthTrust and EPIC would "pay the reasonable fees and expenses of [defense] counsel *selected by [HealthTrust]*."[5]

Shortly after the filing of the *Anderson* suit in 1994, each of the former EPIC directors requested that HealthTrust hire and pay for their defense counsel. Health-Trust accepted this responsibility, and pursuant to § 6.10(a)(i) chose Carrington Coleman Sloman & Blumenthal ("Carrington Coleman") to represent all of the former EPIC directors in the *Anderson* suit.[6] Initially, Carrington Coleman asked that Chamison be represented by different counsel because of a conflict of interest with AMI in, other litigation. HealthTrust then selected Frank Shor ("Shor"), who represented Chamison until Carrington Coleman informed HealthTrust that the conflict with AMI was resolved. With HealthTrust's approval, Shor then withdrew as Chamison's counsel, and Carrington Coleman resumed Chamison's representation.

Chamison, meanwhile, contacted another law firm, Bickel & Brewer, who had represented him and AMI in seeking the earlier injunction against EPIC's board. After discussing Carrington Coleman's group defense strategy in the *Anderson* suit with Chamison, Bickel & Brewer approached Carrington Coleman on Chamison's behalf. Bickel & Brewer accused Carrington Coleman of inadequately representing Chamison-the EPIC Board's only non-SAR-holder-by employing a group defense that did not account for Chamison's unique defense

of lack of pecuniary interest in the SAR buyback and by not asserting Chamison's claim that CEO George misrepresented the value of CEO George's SAR buyback plan to Chamison. Chamison then rejected Carrington Coleman and engaged Bickel & Brewer as counsel in the *Anderson* suit. At this point, HealthTrust informed Chamison that he was violating the counsel selection provision of the indemnification agreement and refused to pay Bickel & Brewer's fees.

Chamison, however, had indemnity protection from another source. Under Chamison's employment agreement with AMH, AMH had agreed to indemnify him "with respect to his service as Executive Vice President of AMH to the full extent permitted under [Delaware] law."[7] Additionally, the Restated Certificate of Incorporation of AMH (which was known as IMA Holdings Corp. when the certificate was filed in 1990) stated: "[T]o the fullest extent permitted by the [General Corporation Law], the Corporation shall indemnify any current or former director or officer of the Corporation."[8] In approximately March 1995, National Medical Enterprises, Inc. ("NME") acquired AMH by means of a reverse-triangular merger.[9] Under the terms of the NME Merger Agreement, NME agreed that all indemnification obligations owed by AMH and its subsidiaries to their present and former officers and directors would remain in full force and effect and in addition would become the direct co-obligations of NME upon completion of the merger.[10] NME has since changed its name to Tenet Healthcare Corporation ("Tenet"). Today AMH is a wholly-owned subsidiary of Tenet. When

---

4. HealthTrust Merger Agreement, § 6.10(a) (the "HealthTrust indemnification agreement"). This contractual obligation to indemnify was for a period of six years from the date of the merger.

5. *Id.,* § 6.10(a)(i) (emphasis added) (the "counsel selection provision").

6. *See* Letter from L. McCain to Chamison (June 1, 1994), DX 16.

7. Letter from R. O'Leary to Chamison (Aug. 4, 1991), DX 2, ¶ 7.

8. DX 1, Article Sixth.

9. *See* Agreement and Plan of Merger, DX 18 [hereinafter "NME Merger Agreement"].

10. *Id.,* § 7.8.

HealthTrust refused to pay Bickel & Brewer's fees, Tenet agreed to pay the legal bills on Chamison's behalf.[11]

In the weeks leading up to trial in the *Anderson* suit, HealthTrust informed Chamison that he would have to rely on Shor as his defense counsel in the *Anderson* litigation in order. to receive indemnification from HealthTrust/ HealthTrust later recommended two other attorneys, but Chamison failed to pursue HealthTrust's offers. Believing that the counsel selection provision of the HealthTrust Merger Agreement required HealthTrust to affirmatively select Chamison's counsel, HealthTrust arbitrarily chose one of them, Jerry Jones, to represent Chamison. Chamison never contacted Jones. Satisfied with Bickel & Brewer's services and concerned that a new lawyer would not have adequate time to prepare his defense, Chamison decided not to pursue HealthTrust's selection of counsel. Meanwhile, before the *Anderson* trial began, Bickel & Brewer succeeded in having the *Anderson* plaintiffs dismiss all claims against Chamison with prejudice.

## II. PARTIES' CONTENTIONS

With Chamison's successful dismissal from the *Anderson* suit, the issue now is who bears ultimate responsibility for his legal bills from Bickel & Brewer. Tenet paid all of Bickel & Brewer's bills. Chamison on behalf of Tenet-now seeks contribution, if not complete indemnification, from HealthTrust for the costs incurred (and paid by Tenet) in defense of the *Anderson*

suit.[12] Chamison argues that because the *Anderson* suit implicated Chamison in his capacity as an EPIC director, it is Health-Trust (via 8 *Del. C.* § 145(c) and § 6.10 of the HealthTrust Merger Agreement) that is primarily responsible for Chamison's Bickel & Brewer bills. Chamison further argues that even if the Court rejects a primary-secondary division of liability in this matter, it is only fair that Health-Trust, as co-indemnitor, pay half of Chamison's Bickel & Brewer bills.

HealthTrust, however, seeks to avoid any contribution towards Bickel & Brewer's legal bills, arguing that: (i) Tenet's payment of Chamison's legal bills necessarily precludes him from showing out-of-pocket loss, an essential element of an indemnification claim, (ii) Chamison has failed to demonstrate his right to bring a contribution or indemnification claim on Tenet's behalf, (iii) Chamison rejected counsel chosen by HealthTrust, in violation of the counsel selection provision of the HealthTrust indemnification agreement, and (iv) Delaware recognizes no primary-secondary division of indemnification liability.

## III. ANALYSIS

### A. Chamison's Lack of damages and Alleged Lack of Standing

As an initial matter, HealthTrust challenges Chamison's standing to bring a contribution/indemnification claim against HealthTrust. First, HealthTrust asserts that because Tenet already paid Chami-

11. Tenet has continued to honor this commitment to indemnify Chamison for the cost of his defense in the *Anderson* suit. Trial Tr. at 135, Docket No. 116.

12. The word "indemnification" is used in two distinct senses throughout this Opinion. First is the concept best associated with 8 *Del. C.* § 145 as the term of art defining a corporation's reimbursement of a director, officer or employee for the costs incurred by that individual in defense of an action brought against that individual in his capacity as a director, officer or employee of the corporation. Second is the more general concept of liability-

shifting from the party who paid a claim to the party who should have paid it. *See The American Insurance Co. v. Material Transit, Inc.,* Del.Super., 446 A.2d 1101, 1103 (1982) (" 'Indemnification' and 'contribution' differ in the extent to which [an entity] is able to rid himself or herself of liability. Where the entire burden of liability shifts from one [entity] to another, indemnification is invoked. On the other hand, where liability is shifted only proportionately with a sharing of the burden among the [entities] contribution exists instead.").

son's expenses, Chamison has no quantifiable injury to assert against HealthTrust.[13] Chamison argues that even though he personally suffered no loss, Tenet has a right to seek partial, if not full, reimbursement for its losses from HealthTrust. HealthTrust responds, on the other hand, that because Tenet is not a named party to this action and Chamison has failed to demonstrate that Tenet transferred its chose in action to him, he lacks standing to assert Tenet's contribution/indemnification claim.

I conclude that by paying Chamison's legal fees, Tenet was subrogated to Chamison's claim. First, the right of subrogation, like that of contribution, rests not on contract, but on general principles of equity. It is a rule "founded on natural justice, and is recognized in every cultivated system of jurisprudence." [14] As I conclude both that Tenet and HealthTrust were obligated contractually to indemnify Chamison and that HealthTrust breached its covenant of good faith and fair dealing, the equitable basis for applying the doctrine of subrogation exists here. Alternatively, rather than belabor the issue of whether Chamison has shown that Tenet assigned its claim to him, I think it makes more sense for this Court to adopt the Superior Court practice that indemnitors may bring actions in the names of their indemnitees.[15] Of course, the underlying purpose of that practice is to allow indemnitors, i.e., insurance companies, to bring suit in the names of indemnitees and thereby hide the existence of the insurance companies from juries. In the Court of Chancery, however, that goal is impossible, because the Chancellor is both fact finder and trier of law.[16] Nonetheless, it would create an unnecessary inconsistency if insurers were required to bring suit in the names of indemnitees in Superior Court but were forbidden to do so in the Court of Chancery. For the sake of consistency among Delaware's trial courts and to enable resolution of the instant dispute on its merits, I hold that Tenet may assert its contribution/indemnification claim in Chamison's name.[17] The issue whether Tenet properly assigned its claim to Chamison, therefore, is moot.[18]

## B. The Indemnification Obligations

Having determined that Chamison may assert this contribution/indemnification claim on Tenet's behalf, the Court must now decide which corporation, as between Tenet and HealthTrust, is the obligated party. The logical way to determine which corporation is responsible for Chamison's Bickel & Brewer bills is to identify the indemnification obligations of each party and to compare them to each other. As explained below, after performing such an analysis, I conclude that Tenet and Health-Trust are obligated contractually *in equal measure* to indemnify Chamison for the costs incurred in the *Anderson* suit.

### 1. HealthTrust

Title 8 of the Delaware Code, section 145(c) states that:

13. HealthTrust is not claiming that the loss did not occur, but only that it passed through to the indemnitor, leaving Chamison without standing to claim a loss.

14. G. Bispham, Principles of Equity (3d ed. 1882) at 397, quoting Chancellor Kent in Cheesebrough v. Millard, 1 Johns Ch. 412. *See also 4 Pomeroy's Equity Jurisprudence* § 1418 (contribution rests upon the maxim, Equality is equity); § 1419.

15. *See Catalfano v. Higgins,* Del.Supr., 188 A.2d 357, 358 (1962) (upholding continued application of rule that "at common law an insurer's subrogation suit must be brought in the name of the insured.").

16. *See Clark II v. Simon,* Del.Super., C.A. No. 85C–MY–1, 1992 WL 354098, Lee, J. (Nov. 9, 1992) (issue of bringing action in name of insurer irrelevant where no jury involved).

17. To promote procedural consistency, the Court of Chancery practice allows an insured to bring suit in the name of an insured, but does not so require.

18. Because this Court has decided that Tenet may pursue its contribution/indemnification claim in Chamison's name, all future references to "Chamison" are meant to include "Chamison, on behalf of Tenet."

To the extent that a director, officer, employee or agent of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

It is undisputed that the *Anderson* suit was a shareholder derivative action brought against Chamison in his capacity as a director of EPIC. Thus, it falls squarely within the category of permissible indemnification situations described in the above-referenced subsection (b).[19] Moreover, it is beyond dispute that Chamison's dismissal with prejudice from the *Anderson* suit constitutes a "success[ ] on the merits or otherwise in defense of [the] action." [20] Thus, it falls squarely within the mandatory indemnification provision of § 145(c). Because Chamison was sued in his capacity as an EPIC director, under § 145(c) EPIC is required to indemnify Chamison for his successful defense of the *Anderson* suit. EPIC, however, is not a party to this indemnification suit.

■ Alternatively, Chamison cannot recover from HealthTrust under the mandatory indemnification provision of § 145(c), because Chamison neither served on HealthTrust's Board of Directors nor served on EPIC's Board at HealthTrust's request.[21] In fact, HealthTrust became the parent (via the reverse-triangular merger) of EPIC at the exact moment that Chamison ceased to serve on EPIC's Board. Chamison similarly cannot recover from HealthTrust under 8 *Del. C.* § 145(h) (assuring the continuation of a constituent corporation's liabilities by charging them to the surviving or resulting corporation) because HealthTrust is *not* a successor-in-interest to EPIC.[22] EPIC still exists and is a *subsidiary* of HealthTrust. Thus, HealthTrust's indemnification obligations toward Chamison arise solely out of the contractual promises made in the context of the HealthTrust Merger Agreement.

■ Under § 6.10(a) of the HealthTrust Merger Agreement, HealthTrust ("Parent") and EPIC ("Surviving Corporation") both warrant that they "shall indemnify to the fullest extent permitted under [Delaware] law the present and former directors and officers" of EPIC for all losses and

19. *See* 8 *Del. C.* § 145(b):

A corporation shall have power to indemnify any person who was or is a party ... to any ... action or suit by or in the right of the corporation to procure a judgment in its favor *by reason of the fact that the person is or was a director, officer, employee or agent of the corporation,* or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation ... against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense of such action. . . .
(emphasis added).

20. *See Galdi v. Berg,* D. Del., 359 F.Supp. 698, 702 (1973) (having charge dismissed with prejudice would constitute "success on the merits or otherwise.").

21. *See* 8 *Del. C.* § 145(b) (" ... by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving *at the request of* the

corporation as a director, officer, employee or agent of another corporation") (emphasis added).

22. 8 *Del C.* § 145(h):

For purposes of this section, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation ... absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation ... shall stand in the same position under this section with respect to the resulting or surviving corporation as he would have with respect to such constituent corporation if its separate existence had continued.

costs, "including reasonable attorney's fees," incurred in connection with any claim or action arising from their service in such capacities prior to and including the closing date.[23] This indemnification provision included the restriction, however, that in the event of any such claim, HealthTrust and EPIC would "pay the reasonable fees and expenses of [defense] counsel *selected by [HealthTrust]*." [24] Although not statutorily required by § 145 to indemnify Chamison, by this provision in the merger agreement, HealthTrust voluntarily obligated itself-in the spirit of § 145-to indemnify former EPIC directors, such as Chamison, subject to the counsel selection provision.[25]

The Court need not decide the exact legal consequence of the expression "to the fullest extent permitted under [Delaware] law" in terms of HealthTrust's indemnification obligations to Chamison-someone who was never an employee or director of HealthTrust, nor an appointee of Health-Trust to another corporation's board. As discussed earlier, HealthTrust accepted its obligation to indemnify Chamison in the *Anderson* suit, subject to the counsel selection provision. Thus, HealthTrust does not dispute its basic contractual obligation to indemnify EPIC's former directors. HealthTrust does argue, however, that the special facts of this case either fail to trigger that obligation or to show that Chamison waived his right to such indemnification. I have examined carefully each of HealthTrust's arguments, but I am not persuaded by any of them.

■ In this case, because Health-Trust's indemnification obligation is contractual-and not statutory-in origin, my analysis begins with an acknowledgement that the HealthTrust indemnification provision included a valid and enforceable counsel selection provision.[26] Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract.[27] As such, a party to a contract has made an implied covenant to interpret and to act reasonably upon contractual language that is on its face reasonable.[28] This implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain.[29] It requires the Court to extra-

**23.** HealthTrust Merger Agreement, § 6.10(a).

**24.** *Id.* § 6.10(a)(i) (emphasis added).

**25.** *See Citadel Holding Corp. v. Roven*, Del. Supr., 603 A.2d 818 (1992) (enforcing agreement making *permissive* provision of § 145 mandatory on the corporation). Chamison also asserts other sources of HealthTrust's indemnification obligations. Because this provision of the HealthTrust Merger Agreement is sufficient to impose an indemnification obligation on HealthTrust and the agreement's validity is not contested (whereas some of Chamison's other alleged sources are contested), this Opinion will rely entirely on § 6.10 of the HealthTrust Merger Agreement as the source of HealthTrust's contractual obligation to indemnify Chamison in the *Anderson* litigation. This Opinion makes no determination as to the validity or effectiveness of the other indemnification sources cited by Chamison.

**26.** Despite HealthTrust's assertion to the contrary, it is *not* clear to the Court that such a restriction would be necessarily consistent with the mandate of § 145(c). *See Witco Corp. v. Beekhuis*, 38 F.3d 682, 691 (3d Cir. 1994) (§ 145(c) is mandatory and grants an absolute right to indemnification); *Green v. Westcap Corp.*, Del.Super., 492 A.2d 260, 265 (1985) (same). These cases suggest that a counsel selection provision would be antithetical to the mandatory indemnification imposed by § 145(c). I need not reach this issue in this case, however.

**27.** *See Wilgus v. Salt Pond Inv. Co.*, Del. Ch., 498 A.2d 151 159 (1985).

**28.** *See, e.g., Gilbert v. El Paso Co.*, Del. Ch., 490 A.2d 1050, 1055 (1984) ("[I]f one party is given discretion in determining whether [a] condition in fact has occurred[,] that party must use good faith in making that determination."), *aff'd*, Del.Supr., 575 A.2d 1131 (1990).

**29.** *See id.* ("This obligation [the implied covenant] requires a party in a contractual relationship to refrain from arbitrary or un-

polate the spirit of the agreement from its express terms and based on that "spirit," determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose.[30] The Court then implies the extrapolated term into the express agreement as an implied covenant and treats its breach as a breach of the contract.[31] The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract.[32] Despite these restrictions, Delaware courts apply this legal theory only in narrow circumstances.[33]

▬ Nonetheless, in a case such as this, where HealthTrust's interpretation of the counsel selection provision effectively allows it to escape its ultimate contractual obligation to indemnify Chamison, the Court must inquire into the reasonableness of that interpretation in light of the indemnification agreement's purpose.[34] HealthTrust asserts that its indemnification obligations were waived by Chamison's rejection of Carrington Coleman. Chamison argues that he rejected Carrington Coleman because Carrington Coleman's planned representation was inadequate. He asserts two bases for his dissatisfaction: (1) the failure of Carrington Coleman to advance the defense that Chamison alone lacked a pecuniary interest in the HealthTrust merger offer and its SAR buyback, and (2) Carrington Coleman's refusal to assert Chamison's claim that CEO George misled him.[35] Thus, the question presented is whether it was reasonable or unreasonable for HealthTrust to demand that Chamison rely on Carrington Coleman the second time, after the parties knew Carrington

reasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." (citing *Restatement (Second) of Contracts* § 205 (1981))).

**30.** *See Katz v. Oak Indus. Inc.*, Del. Ch., 508 A.2d 873, 880 (1986) ("[I]s it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith-had they thought to negotiate with respect to that matter[.] If the answer to this question is yes, then, in my opinion, a court is justified in concluding that such act constitutes a breach of the implied covenant of good faith.").

**31.** *See Shenandoah Life Ins. Co. v. Valero Energy*, Del. Ch., C.A. No. 9032, 14 *Del. J. Corp. L.* 396, 411, 1988 WL 63491, Allen, C. (June 21, 1988) ("The covenant is breached only when one party to a contract seeks to prevent its performance by, or to withhold its benefits from, the other. The mere exercise of one's contractual rights, without more, cannot constitute such a breach." (internal citation omitted)).

**32.** *See Cincinnati SMSA Limited Partnership v. Cincinnati Bell Cellular Systems Co.*, Del. Supr., 708 A.2d 989, 990 (1998) ("We affirm the decision of the Court of Chancery that, given the unambiguous terms set forth in the agreement, no additional obligations may be inferred under any set of facts that could be proven to support plaintiff's complaint."); *Shenandoah Life, 14 Del. J. Corp. L. at 411* (holding that court could not imply rights contrary to express rights granted in debenture agreement).

**33.** *See, e.g., Cincinnati SMSA Limited Partnership*, 708 A.2d at 992 ("In the narrow context governed by principles of good faith and fair dealing, this Court has recognized the occasional necessity of implying such terms in an agreement so as to honor the parties' reasonable expectations. But those cases should be rare and fact-intensive, turning on issues of compelling fairness.").

**34.** *See id.; see also Gale v. Bershad*, Del. Ch., C.A. No. 15714, 1998 WL 118022, Jacobs, V.C. (Mar. 3, 1998, *rev'd* Mar. 4, 1998) (holding that plaintiff pleaded a valid claim for breach of implied covenant where defendant corporation utilized stock appraisal methodology, which it had authority to select, but which possibly breached implied obligation to determine stock's "fair value" in good faith, because appraisal allegedly was skewed towards a low valuation).

**35.** Additionally, Chamison argues, Bickel & Brewer's ability to convince the *Anderson* plaintiffs to dismiss their claims against him with prejudice is indirect, but powerful evidence that Carrington Coleman could not have provided a better defense.

Coleman contemplated a group defense strategy that ignored Chamison's unique defenses.

In light of Chamison's legitimate and compelling reasons for rejecting representation by Carrington Coleman, did the parties' indemnification agreement nevertheless empower HealthTrust to insist that he rely on Carrington Coleman anyway? The agreement's language places no limitation on HealthTrust's ability to select Chamison's defense counsel. Thus, any limitation must be an implied one.

In the absence of language limiting HealthTrust's right to select Chamison's counsel, HealthTrust possessed broad discretion in this matter. HealthTrust, however, abused this discretion by trying to force Chamison to accept a defense that was markedly inferior to an existing and known alternative. The indemnification agreement does not forewarn the director that HealthTrust's right to select his defense counsel supercedes the director's right to pursue his best defense. I note that HealthTrust's indemnification agreement effectively adopted EPIC's § 145 obligations and nothing in that statute indicates that a counsel selection clause trumps a director's right to utilize his best legal defenses. Indeed, § 145's purpose to enable Delaware companies to attract competent directors by offering them indemnification for suits arising from their service to the company—runs counter to the notion that an indemnitor could, through a counsel selection clause, foist a less-than-the-best defense upon an indemnitee.[36] HealthTrust's contractual indemnification of Chamison invoked the same obligations and served the same purposes as § 145.

Therefore, I conclude that their agreement did not contemplate sacrificing a director's defensive options to HealthTrust's counsel selection prerogative.

HealthTrust acted unreasonably in demanding that Chamison accept Carrington Coleman as his defense counsel. By refusing such an unreasonable demand, Chamison did not waive his contractual right to indemnification. On the contrary, by unreasonably restricting Chamison's defense through manipulation of the counsel selection provision, HealthTrust violated its implied covenant of good faith and fair dealing.

 Of course, HealthTrust offered other lawyers to Chamison, and I need to consider that fact as well. HealthTrust argues that even if Carrington Coleman was an inappropriate choice, Chamison's failure to avail himself of HealthTrust's alternative selections constituted a breach of the indemnification agreement. HealthTrust's argument might prevail, except for the circumstances under which HealthTrust demanded that Chamison release Bickel & Brewer. HealthTrust contacted Chamison with the new list of approved counsel at a fairly late stage in the proceedings. It would be an impermissible and unreasonable interpretation of the counsel selection provision to allow HealthTrust, with knowledge that the trial date was fast approaching, to force Chamison to abandon a law firm that had spent considerable time and effort designing a defense in which Chamison had confidence and to accept the unknown defenses that would be raised at the last minute by HealthTrust's alternative counsel.[37] Again, HealthTrust's right to select Chamison's

---

**36.** *See, e.g., Folk et al. Folk on the Delaware General Corporation Law* § 145.2 (general purpose of § 145 was twofold: (1) to allow indemnification of directors and, thereby, (2) attract competent directors to Delaware corporations).

**37.** Chamison's defensive position in the underlying *Anderson* litigation was unique, in that he had no personal financial interest in the transaction that was challenged in that case. I am convinced, after carefully examining all of the evidence at trial as well as the demeanor of the witnesses who testified, that HealthTrust and/or Epic were determined to force Chamison to accept a joint defense with the other director defendants, even though there were significant legal differences in Chamison's defensive position. Whether the reasons for this approach by HealthTrust/Epic were strategic or financial is unclear, but I have no hesitation in finding that it breached

defense counsel cannot be construed so broadly as to permit it to force clearly inferior representation upon Chamison.

Not only must Chamison's reluctance to use HealthTrust's later-approved candidates be examined in light of the timing of HealthTrust's demand, it must also be viewed as a consequence of HealthTrust's earlier breach of the implied covenant of good faith and fair dealing. HealthTrust's oppressive behavior in initially insisting upon Carrington Coleman's flawed defense of Chamison in my opinion was sufficient grounds for Chamison to hire his own counsel. Thus, HealthTrust is estopped by its own breach of the implied covenant from then insisting that Chamison abandon Bickel & Brewer.[38] Therefore, I conclude that Chamison's use of Bickel & Brewer did not violate the indemnification agreement with HealthTrust or excuse HealthTrust from its obligations under that agreement.[39] Consequently, HealthTrust was contractually obligated to pay Bickel & Brewer's fees and costs incurred in defending Chamison in the *Anderson* suit.

### 2. *Tenet*

 As noted above, under Chamison's employment agreement with AMH, AMH had agreed to indemnify him "with respect to his service as Executive Vice President of AMH to the full extent permitted under [Delaware] law."[40] Additionally, the Restated Certificate of Incorporation of AMI stated: "[t]o the fullest extent permitted by the [General Corporation Law], the Corporation shall indemnify any current or former director or officer of the Corporation."[41] Finally, the NME Merger Agreement provided that "all rights to indemnification existing in favor of the present or former directors, officers, employees ... of [AMH] or any of [AMH's subsidiaries] as provided in [AMH's] Certificate of Incorporation or By–Laws ... shall survive the Merger and shall continue in full force and effect ... to the fullest extent and for the maximum term permitted by law" with the exception that NME will "directly assume such obligations" upon completion of the merger.[42]

It is undisputed by the parties that Chamison was AMI's designee to the EPIC Board of Directors. Because Chamison was serving on the EPIC Board "at the request of" AMI, AMI had a mandatory obligation under § 145(c) to indemnify Chamison for the costs incurred in successfully defending the *Anderson* suit,[43] AMI is a wholly-owned subsidiary of AMH. Thus, when Tenet directly assumed AMH's *and its subsidiaries'* indemnification obligations (via § 7.8 of the NME Merger Agreement), Tenet *contractually* obligated itself to honor AMI's § 145(c) indemnification obligation toward Chamison. Like HealthTrust, then, although Tenet had no *statutory* duty to indemnify Chamison, Tenet voluntarily assumed such an obligation (minus the counsel selection

---

the covenant of good faith and fair dealing implied in the contractual indemnification provision.

**38.** *See Hudson v. D & V Mason Contractors, Inc.*, Del.Super., 252 A.2d 166, 170 (1969) ("As a general rule the party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform.").

**39.** *See McLean v. International Harvester Co.*, 817 F.2d 1214, 1221–23 (5th Cir.1987) (Former officer of corporation entitled to indemnification despite having rejected corporation's selection of counsel; rejection of corporation's counsel did not constitute "waiver" of right to indemnification).

**40.** Letter from R. O'Leary to Chamison (Aug. 4, 1991), DX 2, ¶ 7.

**41.** DX 1, Article Sixth.

**42.** NME Merger Agreement, DX 18, § 7.8.

**43.** *See* 8 *Del. C.* § 145(b) ("... by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving *at the request of* the corporation as a director, officer, employee or agent of another corporation" (emphasis added)). *See also VonFeldt v. Stifel Financial Corp.*, Del.Supr., 714 A.2d 79 (1998).

provision) via contract under the auspices of 8 *Del. C.* § 145(b). Unlike HealthTrust, however, when Chamison presented the Bickel & Brewer bills to Tenet, Tenet paid them.

### C. *Tenet's Right of Contribution*

 As explained above, in defense of the *Anderson* suit, Chamison had the right to legal counsel and to expect either HealthTrust or Tenet to pay his full litigation costs. The Legislature created no primary-secondary hierarchy among § 145 indemnitors. Nevertheless, it is clear that the Legislature contemplated situations in which there would be more than one indemnitor under that provision.[44] The General Assembly's silence with regard to priority of obligation does not mean one

44. Section 145 of Title 8 provides in relevant part:

"(a) A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect of any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful.

(b) A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c) To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith."

Subsections (a), (b) and (c) clearly contemplate the possibility that more than one corporation may be the indemnitor of a director, officer, employee or agent who is a party to an action from which an indemnification obligation arises. A corporation has the power to indemnify a director, for example, who is serving, at its request, on the board of another corporation. *See VonFeldt v. Stifel Financial Corp.*, Del.Supr., 714 A.2d 79, 85–86 (1998) (section 145(a) does not oblige Delaware corporations to indemnify those who serve other enterprises at their request, but they may voluntarily choose to do so). In that circumstance, § 145 establishes a framework by which *more than one indemnitor (e.g.,* the requesting corporation and the related or subsidiary corporation) *is potentially liable as Joint indemnitors.* That is precisely the situation here.

indemnitor should bear the entire burden. Rather, this silence makes it impossible to choose the more obligated indemnitor of two contractually obligated indemnitors. I also fear that such a policy would undermine the very purpose of indemnification.[45] If a corporation thought it could escape the responsibility of indemnifying a director on the chance that the entire obligation could be shifted to another contractually obligated indemnitor, the director would suffer the same lack of protection that indemnification under § 145 is intended to prevent. Thus, I conclude that HealthTrust and Tenet—as voluntary, contractual indemnitors of Chamison-were equally responsible for Chamison's Bickel & Brewer bills under the permissive provisions of § 145(b).

Having made this determination, I must answer the question whether Tenet-which paid 100% of Chamison's Bickel & Brewer fees in the *Anderson* suit-is entitled to contribution from HealthTrust-which refused to pay any of those same fees. HealthTrust argues that Delaware law does not recognize a right of contribution among co-indemnitors under § 145. I agree that there is no express adoption of such a right in that section. And no precedent addresses the issue of whether one § 145 indemnitor has a right to seek contribution from another. Delaware nevertheless does recognize a right of contribution. in general.[46]

In arguing against a right of contribution among co-indemnitors, HealthTrust overextends the holding of *Howard, Needles, Tammen & Bergendoff v. Steers, Perini & Pomeroy.*[47] That case stands for the unremarkable proposition that when parties to a contract have expressly allocated indemnification obligations, a court ought not imply a different arrangement than the one expressed in the parties' written agreement. The inviolate principle of not re-writing contracts is inapposite to the case before this Court. The case presented to the Court today involves two separate contracts entered into among different parties. Rather than re-writing either of the contracts-the HealthTrust Merger Agreement or the NME Merger Agreement-this Court is attempting to decide how the contracts operate in relation to one another. Because the purported co-indemnitors share no contractual relationship, yet both have legal obligations to indemnify the same director, the right of Tenet to seek contribution from Health-Trust must be based not in contract, but in principles,of equity and law.

The most logical approach, in my opinion, is to look to conventional insurance law principally from other jurisdictions under which co-insurers insuring the same risk share the loss ratably and have rights of contribution against one another. As a general rule, in the absence of contractual language to the contrary, two insurers who insure the same person for the same risk must share the loss.[48] If one insurer pays

---

45. "The invariant policy of Delaware legislation on indemnification is to 'promote the desirable end that corporate officials will resist what they consider' unjustified suits and claims, 'secure in the knowledge that their reasonable expenses will be borne by the corporation they have served if they are vindicated.' Beyond that, its larger purpose is 'to encourage capable man [and woman] to serve in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve.' " *Hibbert v. Hollywood Park, Inc.*, Del.Supr., 457 A.2d 339, 343–44 (1983) (quoting Ernest L. Folk, III, *The Delaware General Corporation Law* 98 (1972)).

46. *See Estate of Keil*, Del.Supr., 145 A.2d 563, 565 (1958) ("If a lien, charge, or burden of any kind. affecting several, is discharged by one only, he should receive from the rest what he has paid on their behalf."). It is a "well-settled principle that where two or more persons are under a common burden or liability the joint debtor who is compelled to pay more than his share is entitled to contribution from his co-obligors." *Id.*

47. Del.Supr., 312 A.2d 621, 624 (1973).

48. "Where several insurers bind themselves to pay the entire loss ... and one insurer pays the whole loss, the one so paying has a right of action against its coinsurers for a ratable

the full amount on a claim, it may seek contribution of one half from the other.[49] To seek contribution from another insurer, the one seeking contribution must show that the other insurer's liability is concurrent, benefits the same insured, and insures the same risk.[50] If the insurers share these qualities and if one insurer pays more than its share, that insurer may seek contribution from the other insurer.[51]

Here, Tenet has clearly shown that HealthTrust's liability is concurrent with Tenet's, benefits the same indemnitee (i.e., Chamison), and insures the same activity (i.e., his EPIC directorship). Thus, having decided that HealthTrust and Tenet share equally an obligation to indemnify Chamison for his successful defense of the *Anderson* suit, it follows (by applying the principles of insurance law just discussed) that there ought to be an implied right of contribution among the co-indemnitors in this situation.[52] Viewing HealthTrust and Tenet as equal obligors, it is only fair to make them share the indemnity obligation ratably, i.e., by each paying half.[53] This result also is consistent with the equitable doctrine of contribution, which rests upon the maxim, Equality is equity.[54] There-fore, I conclude that a right of contribution among § 145 co-indemnitors exists under Delaware law and ought to be recognized, especially in this instance where one co-indemnitor acted inequitably.

### D. Fees for Fees?

 Chamison (on behalf of Tenet) also seeks indemnification for the costs and attorneys' fees incurred in prosecuting this suit for contribution/indemnification.[55] Ordinarily, under Delaware law, a successful suit for indemnification does not entitle the successful director or officer to recover "fees for fees."[56] This case, however, is not like the typical case where a director seeks fees incurred in prosecuting an indemnification action to a successful conclusion. Instead, this case is more analogous to the concept of indemnification that involves shifting liability from the party who has paid a claim to the party who should have paid it. In short, HealthTrust should have paid half of the Bickel & Brewer bills in the first place. Because HealthTrust refused, unreasonably in my opinion, to acknowledge its obligation from the beginning, HealthTrust's equally obligated co-

---

proportion of the amount paid by it, because it has paid a debt which is equally and concurrently due by the other insurers." 44 *AM. Jur. 2D Insurance* § 1792, at 780–81 (1982).

**49.** *Id.* § 1781, at 770 ("As a general rule, the recovery by an owner, where several insurance policies exist on the same property and amount in the aggregate to more than its value, is restricted to the actual loss, since the contract is one of indemnity only; and in the absence of any provisions in the several policies for a proportionate recovery, the insured is not so limited, but may recover the entire amount from any one of the insurers, in which case such insurer may demand contribution from the other insurers.").

**50.** *See St. Paul Ins. Co. v. Horace Mann Ins. Co.*, Iowa Supr., 231 N.W.2d 619, 621–22 (1975).

**51.** *See 44 AM. Jur. 2D Insurance* § 1781, at 769–70 (1982).

**52.** *See Pozsgay v. Free, III.* App., 87 Ill.App.3d 1113, 42 Ill.Dec. 939, 409 N.E.2d 554, 557

(1980) ("If defendants are compelled to pay more than their share ... the co-indemnitors ... should be required to bear their ratable proportion of the amount the [defendants] are required to pay. An indemnitor, as any joint obligor, who pays more than his share is entitled to contribution from the other indemnitors.").

**53.** *See Estate of Keil*, Del.Supr., 145 A.2d 563, 566 (1958) ("A joint and several obligation under [Delaware] law may be enforced by the creditor against both or either; but as between obligors each of them is liable for one-half the debt.").

**54.** *See Pomeroy's Equity Jurisprudence* at 1072.

**55.** *See* Amended Verified Complaint at 13, Docket No. 95.

**56.** *See Mayer v. Executive Telecard Ltd.*, Del. Ch., 705 A.2d 220, 223–25 (1997) (holding that neither § 145(a) nor § 145(c) authorize indemnification of "fees for fees").

indemnitor, Tenet, agreed to pay the *full amount* of those bills when and as presented. In this situation, if Chamison (*i.e.,* Tenet) must pay the costs and attorney's fees associated with bringing this lawsuit to enforce HealthTrust's obligation to indemnify, then the purpose of indemnification is undermined seriously. Furthermore, HealthTrust (and similarly situated indemnitors) would have an economic incentive to refuse payment of what it should pay in the first place if it were not responsible for the fees incurred to enforce its obligation. Indemnitors such as HealthTrust may avoid the costs and attorney's fees of an enforcement action by paying the indemnification amount due without the necessity of suit.[57] Tenet paid the *full amount* of Bickel & Brewer's fees even though it had no obligation to do so. Accordingly, HealthTrust, not Chamison or Tenet, should bear the costs and fees occasioned by this action, which was necessitated by HealthTrust's unreasonable refusal to acknowledge its contractual obligation to indemnify Chamison.

In addition, EPIC's certificate of incorporation expressly authorized payment of expenses associated with prosecuting a claim for indemnification against EPIC:

"If a claim for indemnification or advancement of expenses hereunder is not paid in full by the corporation within sixty (60) days after a written claim has been received by the corporation, the claimant may .at any time thereafter bring suit against the corporation to recover the unpaid amount of the claim, and if successful in whole or in part, the claimant shall be entitled to be paid the expenses of prosecuting such claim." [58]

The promise to indemnify for expenses of prosecuting a successful claim for indemnification was carried forward in the HealthTrust Merger Agreement, which provides in Section 6.10(b) that HealthTrust shall cause EPIC "to keep in effect" provisions in EPIC's certificate of incorporation and by-laws regarding director and officer indemnification for the benefit of "present and former" directors of EPIC.[59] Section 6.10(b) should be read, in my view, to require HealthTrust to cause EPIC's charter provisions regarding indemnification to survive the merger. It also stipulates that EPIC's charter provisions cannot be amended for six years after the merger "except as required by applicable law or except to make changes permitted by law that would *enlarge* the rights to indemnification thereunder." [60] Therefore, on this ground as well I hold that HealthTrust is obligated *contractually* to pay the costs and fees incurred by Chamison in this action.

## IV. POST–TRIAL DETERMINATION OF FEES

After the trial and decision in this case, the parties could not agree on the amount of fees and costs that were chargeable to HealthTrust. Three issues arose: (a) whether certain Bickel & Brewer fees incurred in the *Anderson* litigation after Chamison's dismissal are properly indemnifiable, (b) whether certain Bickel & Brewer fees are not properly indemnifiable because they are too vague or because they reflect activities on behalf of Tenet, not Chamison, and (c) whether HealthTrust is entitled to set off its obligations to Chamison with certain fees it paid to Carrington Coleman on (it asserts) Chamison's behalf.

57. *See Pike Creek Chiropractic v. Robinson,* Del.Supr., 637 A.2d 418 (1994) (holding that indemnitee is entitled to recover its costs and attorney fees for expenses incurred in enforcing its right to indemnification). To hold otherwise, in my opinion, will create perverse economic incentives for indemnitors, and potentially vitiate the value of indemnification agreements to indemnitees.

58. PXI, EPIC Charter, Art 10.

59. DX 7, HealthTrust Merger Agreement, § 6, 10(b).

60. *Id.* (emphasis added).

### A. Chamison's Post–Dismissal Attorneys' Fees

Section 145(c) of the Delaware General Corporation Law provides:

> To the extent that a director, officer, employee or agent of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

■ Chamison contends that Bickel & Brewer needed to monitor the *Anderson* suit after his dismissal because he might be called as a fact witness, because Chamison might be named as defendant in another suit arising from the same series of transactions, and because those expenses represented a reasonable winding-up of Chamison's defense. This contention ignores the statutory language upon which rests HealthTrust's contractual obligation to contribute towards Chamison's defense. Section 145(c) limits Chamison's indemnification right to costs arising from his successful defense (on the merits or otherwise) in an action. Testifying as a fact witness does not constitute a "defense in any action." Thus, Chamison has no right to indemnification for fees arising from Bickel & Brewer's efforts to monitor the *Anderson* litigation in the event he was called as a fact witness.

Chamison also seeks reimbursement for fees incurred after his dismissal because (he argues) his attorneys needed to monitor the suit in the event he was named in another action. But if another action was filed and Chamison won dismissal, a dismissal for which he sought reimbursement, the Court in that action surely would consider reimbursing Chamison's attorneys for such preparatory efforts. Those preparatory efforts, however, are not relevant to his dismissal from the *Anderson* suit, and fall outside the scope of expenses reimbursable under § 145.

Finally, Chamison's counsel argued at the post-trial hearing that Bickel & Brewer's post-dismissal charges reflected reasonable "winding-up" efforts on Chamison's behalf. I conclude, however, that the various appearances and monitoring activities undertaken by Bicker & Brewer after Chamison's dismissal go far beyond reasonable winding-up activities. Accordingly, I disallow all fees assessed after Chamison's dismissal for the *Anderson* suit.

### B. Vague and Improper Billing by Bickel & Brewer

■ HealthTrust contends that certain billing statements by Bickel & Brewer are vague and, therefore, cannot be properly assessed against HealthTrust. It asserts that other charges actually were incurred on behalf of Tenet, not Chamison. I have examined the specific examples provided by HealthTrust. Some of the billing statements are vague ("Pursue various matters"), while others arc borderline ("Pursue trial issues"). If viewed in isolation from the lawyers' preparation for the *Anderson* trial, the billing statement would fail to convince me that it arose in connection with Chamison's defense in the *Anderson* litigation. Viewed in the context of Chamison's lawyers' preparation for the Anderson suit, however, Bickel & Brewer's itemized billing possesses (if barely so) the minimum detail necessary to convince me that those charges are related to Chamison's defense.

■ HealthTrust also argues that Bickel & Brewer's itemized billing contains activities not chargeable to Chamison's defense. My examination of the examples provided, however, shows that the activities did involve the *Anderson* suit. To disqualify those otherwise permissible charges, HealthTrust needed to provide a reasoned basis for *excluding* them from services provided in conjunction with Bickel & Brewer's defense of Chamison. HealthTrust complains that Bickel &

Brewer also represented Tenet, but that fact does not mean that Bickel & Brewer could avoid handling all the administrative and strategic considerations involved in representing Chamison. I have no basis for concluding that Bickel & Brewer's services on behalf of Tenet required that non-party Tenet subsidize Chamison's defense by absorbing some of the litigation costs otherwise associated with Chamison's defense. Absent evidence that Bickel & Brewer's activities could not have been associated with Chamison's defense, I accept Bickel & Brewer's itemized *Anderson* suit charges as proper. I allow all charges presented by Bickel & Brewer that arose *before* Chamison's dismissal.

### C. HealthTrust's Set–Off

 HealthTrust argues that if Tenet has a right of contribution against HealthTrust, HealthTrust also must have a right of contribution against Tenet, Therefore, HealthTrust concludes, it has a right to set off its contribution towards Tenet's expenses on behalf of Chamison with any defense expenses incurred by HealthTrust.

HealthTrust's logic is impeccable, but the facts do not support its claim. It is undisputed that Carrington Coleman rendered legal services in connection with the *Anderson* suit. What is absent, however, is a nexus between Carrington Coleman's services and Chamison's defense on the merits in the Anderson action. The statute (8 Del. C. § 145) requires only that expenses be "actually and reasonably incurred," which affords this Court discretion to include costs associated with a director's defense that do not directly contribute to the director's successful defense. The question boils down to whether HealthTrust's payments to Carrington Coleman fall within that discretionary range.

Consider this example: a law firm renders trial preparation services where those services are incurred during the time that the same law firm filed a motion to dismiss on behalf of the client director and the time that the court granted the motion to dismiss. The trial preparation services, it seems to me, meet § 145's statutory requirement that reimbursable expenses be "actually and reasonably incurred." It would make no sense to try to compartmentalize a lawyer's strategic efforts on behalf of a director client into a "reimbursable successful strategy" and "unsuccessful or mooted strategies." Nothing in our statute's language suggests such an approach. So long as the attorneys act in good faith and raise reasonable defenses, they may employ a number of strategic defenses, all of which should be reimbursed.[61]

Similarly, consider if a law firm prepared a director's defense for trial, but the director fired the firm and hired another firm before trial. Suppose, too, that the new firm obtained the old firm's preparatory materials and referred to them in shaping the new firm's ultimately successful defense for the director. In the proper circumstances, the old firm's expenses in gathering information and preparing its defense for the director might well fall within the scope of "actually and reasonably incurred" expenses that qualify for reimbursement.

In this case, however, no evidence was presented that Carrington Coleman shared any of its work product with Bickel & Brewer. Nor is there evidence linking Carrington Coleman's efforts and Chamison's ultimately successful defense. Thus, Carrington Coleman's expenses cannot be tied to Bickel & Brewer's successful defense on behalf of Chamison and cannot be used as a set off against Bickel & Brewer's fees.

In addition, I note that Carrington Coleman's defense did not employ the best strategy for this individual director, who was named a defendant even though he

---

61. The same logic explains, in part, why I reject HealthTrust's argument that some of Bickel & Brewer's itemized charges should be attributed to Tenet, not Chamison.

was not a SAR holder. HealthTrust's foisting of an inadequate strategy on Chamison constituted one of the grounds for my findings of bad faith. A legal strategy that constitutes bad faith cannot be deemed reasonable within the meaning of an expense "actually and reasonably incurred." For this reason as well, HealthTrust's payments to Carrington Coleman do not meet the criteria for reimbursable attorney fees and expenses.

Tellingly, HealthTrust can identify specifically only $8,000 (out of almost $1,000,000) of Carrington Coleman fees as *solely* related to Chamison's defense. It arrives at a total set off of $208,113.76 by claiming that Chamison, as one of five directors, was responsible for twenty percent of Carrington Coleman's total bill, arising from its common defense of all five directors in the *Anderson* litigation.[62] By this means, HealthTrust effectively tries to impose on Chamison, a disinterested director, part of the cost of defending the interested directors whose participation in the SAR was the crux of the *Anderson* litigation. Such a result would be inequitable and unfair. Carrington Coleman's efforts, so far as I can tell on this record, had no connection with Chamison's dismissal from the *Anderson* litigation. Accordingly, HealthTrust has no right to a set off.[63]

## V. CONCLUSION

By paying all of Bickel & Brewer's bills, Tenet was subrogated to Chamison's claim for indemnification against HealthTrust. Tenet, however, was already obligated to Chamison for half of the cost of defending the *Anderson* suit. Thus, whatever Tenet can collect from HealthTrust via its right of subrogation must be discounted by the amount that Tenet itself owed Chamison. I have determined that Tenet and HealthTrust owed equal one-half shares of the cost of Chamison's defense in the *Anderson* suit. Defendant HealthTrust is ordered to reimburse Tenet for half the costs Tenet paid in defending Chamison up until the time of his dismissal in the *Anderson* suit. In addition, HealthTrust is ordered to reimburse Tenet for the entire amount of attorney's fees and costs incurred in prosecuting this action for contribution/indemnification from HealthTrust Although HealthTrust equally would be entitled to reimbursement by Tenet for half of the costs HealthTrust paid in defending Chamison in the *Anderson* action, I have determined that HealthTrust's expenses were not shown to be reasonably incurred on Chamison's behalf. I therefore deny HealthTrust's request for an offset against the amount it owes to Chamison.

Counsel for Chamison should submit an Order, in accordance with this Opinion, setting forth the sum owed based upon the above findings and conclusions.

---

62. *See* Ishak April 6, 1999 letter. Exh. B (Bryant Affd. ¶ 6).

63. HealthTrust also objects to the award of fees for fees, but its complaint is untimely under Court of Chancery Rule 59(f). In addition, HealthTrust completely ignores the alternative contractual basis for the decision to award fees for fees. *See* footnotes 58–60 and accompanying text, *signa.*