van Gestel, J.
This matter comes before the Court on a motion to dismiss by the defendants. The defendant The Gillette Company (“Gillette”) stands and answers for all purposes in this matter for the other named defendants: Oral-B Laboratories, Inc. (“Oral-B”) and Gillette Canada, Inc. (“Gillette Canada”). However, because the agreement in issue was executed by Oral-B, for purposes of this memorandum the defendants generally and collectively will be referred to as Oral-B.
The motion, filed pursuant to Mass.R.Civ.P. Rule 12(b)(6), challenges all counts of the plaintiffs complaint. Oral-B argues that Count I fails because the “Cell” contemplated by the agreement does not now exist and never has existed. Count II fails, it says, because there are no allegations of a representation that was either false or went beyond opinion. Count III fails, Oral-B says, because there are no allegations of any actions by it that were designed to frustrate the plaintiffs goals of the agreement. Count IV fails, Oral-B. argues, because the complaint fails to allege any conduct beyond the reach of the agreement, any conduct occurring within Massachusetts, and any conduct that would circumvent the clear choice of law provision of the agreement.

*570
BACKGROUND

The Court, on this motion to dismiss, takes the facts mostly as the plaintiff, Moll Industries, Inc. (“Moll”), pleads and recites them, it being probably the best way to express what the complaint says and what the inferences are that may be drawn from its statement. In that process, however, the Court is quick to observe that this case is principally about a detailed written contract between highly sophisticated parties.
Moll sued all defendants here, complaining that they committed breach of contract, misrepresentation, breach of an implied covenant of good faith and fair dealing, and unfair and deceptive business practices by wrongfully terminating an agreement with Moll regarding the production of “CrossAction” brand toothbrushes.
The complaint alleges that in 1998, Oral-B introduced CrossAction toothbrushes for sale to the general public. At or about the same time, Oral-B entered into discussions with Moll for the purpose of determining whether Moll could employ its injection-molding technology to produce a version of the CrossAction toothbrush that was comparable in quality to the version manufactured in house by Oral-B. As a result of those discussions, Oral-B and Moll entered into a written agreement on July 9, 1998 (the “July 1998 Agreement”), pursuant to which Moll undertook to develop a manufacturing cell for a “bristled, in-molded, tufted, toothbrush” that would be “capable of producing 12.0 (twelve) million units[2] annually . . .”
Moll’s in-molding process requires the use of “spool fed” bristle filament. The parties soon discovered that it was not then possible to produce an in-molded version of the CrossAction toothbrush to Oral-B’s specifications due .to the lack of an acceptable spool filament. Consequently, Oral-B terminated the July 1998 Agreement and, according to the terms of that agreement, paid Moll $285,000 for the reasonable project costs that Moll had incurred in attempting to develop a successful in-molding manufacturing process for the CrossAction toothbrushes.
About six months after the July 1998 Agreement was terminated, Oral-B again approached Moll to explore Moll’s continued interest in developing a production line to manufacture in-molded CrossAction toothbrushes, using spooled bristle filament supplied by a Mexican manufacturer with which Gillette had done business. Oral-B represented to Moll that it was confident that the spooled filament supplied by Gillette’s preferred supplier would prove acceptable for use in CrossAction toothbrushes, meeting Oral-B’s specifications. Induced by Oral-B’s representations, Moll entered into a second Supply Agreement with Oral-B on September 1, 1999 (the “September 1999 Agreement”), a copy of which is appended to the complaint as Exhibit B.
The September 1999 Agreement, like the July 1998 Agreement,[3] required Moll to develop an “in-molded spool fed toothbrush manufacturing cell (“Cell") capable of producing at a rate defined in Schedule 3” to the September 1999 Agreement. This Agreement established a 12 cents per unit ’’equipment amortization" charge on the first 20,000,000 units produced by Moll, for a total amortization cost of $2,400,000. The September 1999 Agreement also gave Oral-B the right to terminate the parties’ contract in the event that Moll was “unable to bring the Initial Product Samples up to [Oral-B’s] Specifications within a reasonable time ..." Oral-B and Moll further agreed, however, that in the event the “Agreement is terminated before the Cell is fully amortized, the parties shall discuss and implement an equitable return for [Moll] to recover the unamortized cost of the Cell,” which “equitable return,” the parties stated, would be “based upon Schedule 3.”
Pertinent parts of the September 1999 Agreement follow.
In the “WHEREAS” portion it is recited:
A. Oral-B has expertise and information relating to manufacturing, marketing, promoting and distributing toothbrush products, which are particularly those currently marketed in the US under the trademark CrossAction as in Schedule 1 attached hereto and made a part hereof (hereinafter called the “Products”); and
B. Oral-B desires to make an arrangement for the manufacturing, packaging and supply of the Products in accordance with certain methods, formulae, standards and specifications described in Schedule 2 attached hereto and made a part hereof (hereinafter called the “Specifications”); and
C. Anchor has expertise relating to manufacturing, packaging and supplying of toothbrush products, is capable of producing and packaging the Products according to the Specifications and applicable laws including United States Food & Drug Administration Current Good Manufacturing Practices (hereinafter called the “GMP’s”) and is willing to enter into an Agreement with Oral-B to manufacture, package, and supply the Products according to the terms and conditions set out below; . . .
The basic manufacturing, packaging and supply provisions of the September 1999 Agreement are found in Section 3. Portions pertinent to the present motion read as follows:
A. Using its own technology, Anchor shall manufacture an in-mold spool fed toothbrush manufacturing cell (“Cell”) capable of producing at least 12 million units/annum. Said cell to be paid for by Anchor and amortized at a rate defined in Schedule 3, provided that if this Agreement is terminated before the Cell is fully amortized, the parties shall discuss and implement an equitable return for Anchor to recover the unamortized cost of the Cell. *571 The equitable return will be based upon Schedule 3.
B. Anchor will guarantee the availability to Oral-B of a minimum capacity of at least 12 million units each year.
C. The Products will be manufactured using equipment approved by Oral-B. Such equipment shall be deemed approved when it produces commercial quantities of Product that are approved in accordance with Paragraph 1. Any modifications to the approved equipment that could alter the Products’ conformance to the Specifications will require Oral-B’s reevaluation and approval in accordance with Paragraph 1, above.
D. Anchor shall bear all expenses (including without limitation, depreciation) and/or capital required to purchase, construct, assemble and maintain equipment described in paragraph 3A, including subassemblies thereof. . .
F. All raw materials and components required in the manufacture and packaging of the Products shall be purchased, supplied and tested by Anchor in accordance with the Specifications. All costs incurred for storage of raw material components and finished Products will be the responsibility of Anchor.
Section IB includes a procedure whereby Anchor is to manufacture and deliver to Oral-B samples of the toothbrushes to be manufactured. Oral-B’s Director of Quality Control will then inspect the samples for conformance with the Specifications. Anchor may not proceed with any manufacturing until the Product samples have been approved. This section includes the following:
In the event that the Initial Product Samples are rejected by the Director of Quality Control more than once (Anchor having been apprised of the reason therefor and given a [sic] opportunity to cure) and it appears in the sole judgment of the Director of Quality Control that Anchor will be unable to bring the Initial Product Samples up to Specifications within a reasonable time, then Oral-B may, at its option, terminate this Agreement forthwith and without any penalty provided that if Anchor disagrees with Oral-B regarding compliance with Specifications, Oral-B will resample Initial Product Sample and verity its initial findings, giving notice thereof to Anchor in accordance with Paragraph 14 below.
By Section 15, “any disputes regarding the rights and obligation of the parties to” the September 1999 Agreement “will be resolved under the law of the State of Delaware, without reference to its choice of law provisions.”
Section 16 contains an integration clause which reads:
This Agreement including the Schedules thereto contains the entire Agreement between the parties with respect to the subject matter hereof and supersedes all prior Agreements whether oral or written, express or implied, and all terms and conditions in either party’s purchase order, sales confirmation or similar form subsequently delivered between the parties in respect of the formulation, manufacture and packaging of the Products. Each party acknowledges that it has not relied on any representations made by the other which are not expressly set forth in this Agreement.
Pursuant to the September 1999 Agreement, Moll devoted substantial time and resources to the Oral-B project for over a year. Despite its best efforts, Moll once again was unable to produce an in-molded version of the CrossAction toothbrush in 1999-2000 that received Oral-B’s approval. The obstacles encountered by Moll included significant delays in the delivery of spooled filament material from Gillette’s preferred Mexican supplier; serious problems with the performance of the filament that eventually was supplied; further delays resulting from Oral-B’s decision to close, in the middle of the project, its R&D facility in Belmont, California; and problems in configuring the components of the manufacturing cell to fulfill all of the specific performance requirements imposed by Gillette and Oral-B.
On November 9, 2000, Gillette, through Oral-B, notified Moll that it was terminating the September 1999 Agreement on the ground that "the CrossAction toothbrushes produced by [Moll] still do not meet Oral-B’s specifications, despite twelve months of effort on both our parts.”
Moll alleges, solely on information and belief, that Gillette and Oral-B terminated the September 1999 Agreement not because of the problems that Moll had encountered in manufacturing in-molded CrossAction toothbrushes, but rather because Gillette’s and Oral-B’s strategic direction had changed, and they believed that they could produce comparable toothbrushes more cheaply in other locations, including Ireland. In short, Moll claims that the problems of meeting specifications were just a bad faith “pretext” for a decision to get out of the September 1999 Agreement.
After the November 2000 termination, Moll made multiple written demands for payment for its project-related equipment, tooling and material costs, in conformance with the terms of the September 1999 Agreement. These amounts were not paid, and this suit followed.

DISCUSSION

A Rule 12(b)(6) motion admits all well-pleaded allegations of the complaint, and the Court must accept as true such inferences as may be drawn in the plaintiffs favor. Blank v. Chelmsford Ob/Gyn P.C., 420 Mass. 404, 407 (1995); Natick Auto Sales, Inc. v. *572 Department of Procurement and General Services, 47 Mass.App.Ct. 625, 630 (1999). Of course', conclusions of law from the facts alleged are open for review on a Rule 12(b)(6) motion. The complaint here, however, is sufficient unless it shows beyond doubt that no provable set of facts would entitle the plaintiff to relief. Warner-Lambert Company v. Execuquest Corporation, 427 Mass. 46, 47 (1998); Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 68 (1992). The plaintiff bears a “relatively light burden,” Warner-Lambert Co., supra, 427 Mass. at 47, and must be given the benefit of any doubts. Kipp v Keuker, 7 Mass.App.Ct. 206, 210 (1979). These are “generous principles,” and the Court will apply them in the way they are intended. Connerty v. Metropolitan District Commission, 398 Mass. 140, 143 (1986).
The September 1999 Agreement looms large in any decision regarding the merits of this case. The Agreement, as observed earlier, is appended to — and thereby a part of — the complaint. It is central to the entire case and, as such, it must be interpreted by the Court in reaching its conclusions on the pending motion.
The interpretation of an unambiguous agreement is an issue of law for the Court. To that extent, although there may be some limited differences in the substantive law, on the aspects of how the Court goes about its interpretive process the law of Delaware, that by the Agreement applies here, is not in any significant way different from that of Massachusetts. See, e.g., Hallowell v. State Farm Mut. Ins. Co., 443 A.2d 925, 926 (Del. 1982); Lumbermans Mut. Cas. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995). Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contract provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation, at 381. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
When an element of ambiguity does appear in a contract, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. MacDonald v. Gough, 326 Mass. 93, 96 (1950). “The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the agreement as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
In construing the September 1999 Agreement, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the transaction and the purposes to be accomplished. Starr v. Fordham, 420 Mass. 178, 190 (1995); Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981). Significantly here, the parties are extremely sophisticated in the matters in issue. Indeed, in the WHEREAS clauses of the Agreement, they each trumpet their expertise relating to the manufacturing, packaging and supplying of toothbrush products, and Moll acknowledges its capabilities to perform as agreed. Further, this was the second attempt by these parties to produce the Oral-B Cross-Action toothbrush. Thus, here, perhaps more than in other situations, where sophisticated and knowledgeable parties choose to embody their relationship in a detailed and carefully crafted written instrument, they are entitled to and should be held to the contractual language they chose. The Court should be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instrument that are specifically anticipated and addressed within the agreement overwhelm or change the contract itself. “Courts cannot . . . [, for example,] use commercial context to override express provisions of a contract.” Plymouth Rubber Co., Inc. v. Insurance Company of North America, Inc., 18 Mass.App.Ct. 364, 369 (1984).
The Court will address the complaint count by count, as those counts appear therein.

Count I

Count I states that Gillette and Oral-B, by engaging in the conduct described, have breached their contractual agreements with Moll.
In the September 1999 Agreement Moll — a self-professed expert in the “manufacturing, packaging and supplying of toothbrush products” — "using its own technology" committed to “manufacture an in-molded spool fed toothbrush manufacturing cell . . . capable of producing at least 12 million units/annum.” The “units,” as mentioned above, were Oral-B CrossAction toothbrushes.
Moll further agreed to a procedure whereby samples of the CrossAction toothbrushes it was going to manufacture first would be submitted to Oral-B’s Director *573 of Quality Control for an inspection to determine conformance with Oral-B’s contractual specifications. The Agreement provides that in the event the samples “are rejected . . . more than once ([Moll] having been apprised of the reason therefor and given an opportunity to cure) and it appears in the sole judgment of the Director of Quality Control that [Moll] will be unable to bring the . . . Samples up to Specifications within a reasonable time, then Oral-B may, at its option, terminate [the] Agreement forthwith and without penalty ...” (Emphasis added.)
In Paragraph 16 of its own complaint, Moll concedes that “[d]espite its best efforts, Moll Industries once again[4] was unable to produce an in-molded version of the CrossAction toothbrush in 1999-2000 that received Oral-B’s approval.” Moll recites a number of obstacles, some of which appear not to be of its own making, but rather related to delivery delays of the spooled filament material and serious problems with the performance of the filament that eventually was supplied. Others of the obstacles, however, include “problems in configuring the components of the manufacturing cell to fulfill all of the specific performance requirements imposed by Gillette and Oral-B."
On the issue of delays in the delivery of the spooled filament material and the problems with its performance, there are unambiguous provisions in the Agreement that lay responsibility for these issues at Moll’s doorstep. Section 3A mandates that Moll will use “its own technology,” and Section 3E directs that “[a]ll raw materials and components required in the manufacture and packaging of the Products shall be purchased, supplied and tested by [Moll] in accordance with the Specifications."
The agreement language similarly requires Moll to produce and package the toothbrushes according to the specifications. Thus, problems in configuring the components of the manufacturing cell to fulfill all of the specific performance requirements imposed by Oral-B are also obligations of Moll unless — as is not alleged in the complaint — Oral-B imposed some new requirements that were not in the Specifications attached in Schedule 2 of the Agreement.
Under the circumstances of the specific and unambiguous contract language chosen by the parties and the admissions by Moll in its complaint of its failures, it cannot be said that Oral-B’s termination of the Agreement was improper. Moll really does not argue to the contrary. Rather, it says that the breach is the post-termination failure of Oral-B to discuss and implement an equitable return for Moll to recover the unamortized cost of the Cell. Moll points to Section 3A of the Agreement, which reads in its entirety:
Using its own technology, Anchor shall manufacture an in-mold spool fed toothbrush manufacturing cell (“Cell”) capable of producing at least 12 million units/annum. Said cell to be paid for by Anchor and amortized at a rate defined in Schedule 3, provided that if this Agreement is terminated before the Cell is fully amortized, the parties shall discuss and implement an equitable return for Anchor to recover the unamortized cost of the Cell. The equitable return will be based upon Schedule 3.
Moll’s breach of contract claim depends upon the Court’s interpretation of this provision. Moll argues that the Agreement only requires it to develop an “in-mold spool fed toothbrush manufacturing cell (“Cell”) capable of producing at least 12 million units/annum.” Oral-B argues that the cell developed must be capable of producing units that meet Oral-B’s specifications for CrossAction toothbrushes.
The Court agrees with Oral-B. Section 3A of the Agreement cannot be read in total isolation. Considering, as it must, the entire instrument and the general scheme it reveals, the Court finds it clear that what these parties’ agreement was about was the manufacture of an in-mold spool fed cell capable of producing Oral-B’s CrossAction toothbrushes. That is what Moll, in WHEREAS clause C, said it had expertise in accomplishing and was “capable of producing and packaging . . . according to the Specifications.” And that is for what Moll was to “bear all expenses (including without limitation, depreciation) and/or capital required to purchase, construct, assemble and maintain equipment described in paragraph 3A.” To read the Agreement to require Oral-B to make an equitable return to Moll for a cell that cannot produce CrossAction toothbrushes that meet Oral-B’s specifications would not be a construction that gives effect to the Agreement as a rational business instrument. See, e.g., Starr, supra, 420 Mass. at 192.
Further supporting the Court’s conclusion is the fact that the cell was to be amortized by increasing the price of each unit produced by Moll beyond the actual production costs by 12 cents. In other words, the sales of produced product were to be the source of the amortization payments. Thus, again, the parties contemplated a cell that would produce acceptable product such that the amortization process could occur. There was no misunderstanding by these sophisticated parties on this point.
Moll’s construction is not reasonable and cannot, therefore, overcome a motion to dismiss.

Count II

This count makes a claim of negligent or intentional misrepresentation. Under Delaware law, much like that in Massachusetts, a claim for negligent misrepresentation requires allegations that a defendant, in the course of its business, supplied false information, for the guidance of others, upon which the plaintiff justifiably relied, and the defendant failed to exercise reasonable care or competence in obtaining or communicating the information. See, e.g., In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund *574 (Retirement Accounts) II, L.P. Securities Litigation, 848 F.Sup. 527, 555 (D.Del. 1994).
To state a claim for intentional misrepresentation, there must be allegations that the defendant made a false statement of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act, and there was action in reliance thereon to the plaintiffs detriment. See, e.g., Lord v. Souder, 748 A.2d 393, 402 (Del. 2000).
The allegations that purport to support Count II seem to be in paragraphs 12 and 13 of the complaint. In essence it is charged — and at this time must be accepted as true — that Oral-B stated that “it was confident that the spooled filament supplied by its preferred Mexican manufacturer would prove acceptable for use in Oral-B toothbrushes, and that the new filament would allow Moll to develop a successful manufacturing process for CrossAction toothbrushes as originally contemplated in the July 1998 Agreement.” It is then alleged that based upon these representations, Moll entered into the September 1999 Agreement.
Again, an examination of the September 1999 Agreement is in order. Nowhere in that Agreement is there any mention of using a “preferred Mexican manufacturer” as the source for the spooled filament. In fact, in language stark in its clarity, “[a]ll raw materials and components required in the manufacture and packaging of the Products shall be purchased, supplied and tested by Moll in accordance with the Specifications.” (Emphasis added.) And again, it was [Moll] that stated that its expertise in the manufacturing, packaging and supplying of toothbrush products would enable it to produce and package Oral-B’s CrossAction toothbrushes according to specification.
Further, although it cannot really be decided on this motion, there is a serious and obvious question as to whether any reliance by Moll on the alleged statements, if made, would be considered reasonable. It was Moll’s injection-molding technology, not that of Gillette or Oral-B, that was to be utilized. Moll was the entity that knew best — perhaps, indeed, the only entity that knew at all — its own technology. Would Moll, under those circumstances, be reasonable in relying on Oral-B’s statement of confidence about a spooled filament supplier for a second attempt at a project that failed the first time because of problems in obtaining a satisfactory spooled filament material?
In Section 16 of the Agreement, the parties included an integration clause reading:
This Agreement including the Schedules thereto contains the entire Agreement between the parties with respect to the subject matter hereof and supersedes all prior Agreements whether oral or written, express or implied, and all terms and conditions in either party’s purchase order, sales confirmation or similar form subsequently delivered between the parties in respect of the formulation, manufacture and packaging of the Products. Each party acknowledges that it has not relied on any representations made by the other which are not expressly set forth in this Agreement.
The language of this clause is clear, strong and without ambiguity. It is readily understandable to sophisticated business entities like Moll and Gillette, and it must be given meaning under the circumstances presented.
Delaware law, like that in Massachusetts, recognizes that ”[t]he existence of such a[n] [integration] clause in a formal written contract between sophisticated parties is, in the absence of unconscionable or other extraordinary circumstances, conclusive evidence that the parties intended the written contract to be their complete agreement.” J.A. Moore Const. Co. v. Sussex Associates Ltd., 688 F.Sup. 982, 987 (D.Del. 1988). See, also In re Bank of New England Corp., 210 B.R. 404, 410 (Bkrtcy.D.Mass. 1997). Given Moll’s contractual total responsibility regarding all raw materials, the absence of any contractual mention of a “preferred” Oral-B supplier, the lack of any allegations in the complaint suggesting any unconscionable or other extraordinary circumstances and the exceptional sophistication of the parties, the integration clause trumps the misrepresentation claim.

Count III

Count III charges a breach of the implied covenant of good faith and fair dealing. The allegations supporting this count seem mostly quartered in Paragraphs 19 and 20. There, Moll, on information and belief, suggests that Oral-B’s reliance on the failure of the toothbrushes to meet specifications as a basis to terminate the Agreement was pretextual. Rather, Moll alleges, the reasons for termination were for financial and other unrelated reasons.
Delaware seems to apply the theory of implied covenant of good faith and fair dealing on a slightly more limited basis than Massachusetts. “In the narrow context governed by principles of good faith and fair dealing, this Court has recognized the occasional necessity of implying such terms in an agreement so as to honor the parties’ reasonable expectations. But those cases should be rare and fact-intensive, turning on issues of compelling fairness.” Chamison v. Healthtrust, Inc., 735 A.2d 912, 921 (1999), citing Cincinnati SMSA Limited Partnership v. Cincinnati Bell Cellular Systems Co., 708 A.2d 989, 992 (1998). The implied covenant is a “judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties’ bargain.” Id. at 921. See also Continental Ins. Co. v. Rutledge & Co., Inc., 750 A.2d 1219, 1234 (2000). “The mere exercise of one’s contractual rights, without more, cannot constitute *575 such a breach [of the implied covenant of good faith and fair dealing].” Shenandoah Life Insurance Company v. Valero Energy Corporation, CIV. A. No. 9032, 1988 WL 63491, at *1 (Del. Ch., June 21, 1988).
In the case before the Court, Oral-B had the right to terminate at any time for any reason. Consequently, there must be more than just the act of termination to bring the implied covenant into play. Moll argues that the needed additional element is contained in its allegations that Oral-B’s strategic direction had changed, and it believed it could produce comparable toothbrushes more cheaply in other locations. No Delaware case citations are proffered supporting the proposition that motive alone, in the face of a clear contractual right to act in a certain way, is sufficient to bring the implied covenant to bear.
“[T]he implied covenant cannot contravene the parties’ express agreement and cannot be used to forge a new agreement beyond the scope of the written contract.” Chamison, supra, 735 A.2d at 921. Here, the Agreement required Moll to produce toothbrushes that met specifications. In that regard Section IB included a procedure whereby Anchor was to manufacture and deliver to Oral-B samples of the Products to be manufactured. Oral-B’s Director of Quality Control then would inspect the samples for conformance with the Specifications. Anchor was contractually barred from proceeding with any manufacturing until the Product samples were approved. Section IB includes the following:
In the event that the Initial Product Samples are rejected by the Director of Quality Control more than once (Anchor having been apprised of the reason therefor and given a opportunity to cure) and it appears in the sole judgment of the Director of Quality Control that Anchor will be unable to bring the Initial Product Samples up to Specifications within a reasonable time, then Oral-B may, at its option, terminate this Agreement forthwith and without any penalty provided that if Anchor disagrees with Oral-B regarding compliance with Specifications, Oral-B will resample Initial Product Sample and verify its initial findings, giving notice thereof to Anchor in accordance with Paragraph 14 below.
Oral-B’s November 9, 2000, termination notice is appended to the complaint and thereby becomes a part thereof. It explicitly cites to Section IB failures as the grounds for termination. Nowhere in the complaint, including any of its appendages, are there any allegations that the factual statements by Oral-B regarding failure to meet specifications are incorrect, or that Moll disagreed and asked for re-sampling of the samples in issue. Thus, to say that the implied covenant can trump the express provisions of the Agreement because Oral-B may also, for other reasons, have wanted to terminate the Agreement, runs counter to recently reaffirmed Delaware law.

Count IV

Count IV is the ever-present G.L.c. 93A complaint. It is not explicated in any detail. Apparently, however, it is grounded on the same allegations said to make out the misrepresentation claim.
In addition to suffering from the weaknesses of the misrepresentation claim, Count IV has two other fatal flaws.
First, Section 15 of the Agreement mandates that any “disputes regarding the rights and obligations of the parties to this Agreement will be resolved under the law of the State of Delaware, without reference to its choice of law provisions.” G.L.c. 93A, of course, is not a law of Delaware.
Second, nothing in the complaint alleges any unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce in the Commonwealth of Massachusetts. Moll did what it did at its Anchor Division in Tennessee. Oral-B, a Division of Gillette Canada, Inc., operated from its facility in Belmont, California. G.L.c. 93A, Sec. 11, specifically prohibits the bringing of an action thereunder “unless the actions and transaction constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.”
While it is the defendants’ burden to prove the point, the Court can certainly look to the plaintiffs complaint and its appendages and, if they establish without doubt the proposition, it may be able to conclude that the defendants’ burden has been met. Clearly, here the overwhelming conclusion to be drawn from the documents is that the actions in issue did not occur “primarily and substantially” within the Commonwealth. Indeed, they occurred here hardly at all.

ORDER

For the various reasons stated above, The Gillette Company’s Motion to Dismiss is ALLOWED.

 A “unit” is a CrossAction toothbrush.

 Both agreements are between “Oral-B Laboratories, a Division of Gillette Canada, Inc.,” of Belmont, California, and “Moll Industries, Inc., Anchor Brush Division,” of Morristown, Tennessee. Thus, the names “Oral-B” and “Anchor” appear with frequency in the documents.

 The “once again” phrase relates to the failures that occurred under the earlier July 1998 Agreement. That earlier agreement failed because of a lack of an acceptable spool filament.