# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

COMVEST CAPITAL II, L.P.,           )
                                    )
    Plaintiff,                         )
                                    )
v.                                  )   C.A. No. N15C-08-110 JRJ CCLD
                                    )
GREGORY SELKOE,                     )
                                    )
    Defendant.                         )

## ORDER

**AND NOW TO WIT,** this 26th day of April, 2016, having heard and duly considered Plaintiff's Motion to Dismiss and for Judgment on the Pleadings;[1] Defendant's Response;[2] and Plaintiff's Reply,[3] **IT APPEARS THAT:**

**Background**

1.    Comvest Capital II, L.P. ("Comvest"), CapX Partners, and Karmaloop, Inc. ("Karmaloop") entered into an Amended and Restated Credit Agreement dated June 27, 2014 ("Credit Agreement").[4] In connection with the Credit Agreement, Gregory Selkoe ("Selkoe"), the founder and former CEO of Karmaloop, executed an Amended and Restated Limited Personal Guaranty

---

[1] Plaintiff's Opening Brief in Support of its Motion to Dismiss and for Judgment on the Pleadings ("Comvest Mot. Dismiss") (Trans. ID. 58094883).
[2] Answering Brief of Defendant Gregory Selkoe in Opposition to Plaintiff's Motion to Dismiss and for Judgment on the Pleadings ("Selkoe Answer") (Trans. ID. 58229008).
[3] Plaintiff's Reply Brief in Support of its Motion to Dismiss and for Judgment on the Pleadings ("Comvest Reply") (Trans. ID. 58295905).
[4] Compl. ¶ 1 (Trans. ID. 57713671).

Agreement ("Guaranty").[5] In March of 2015, Selkoe, Karmaloop, and Comvest executed three amendments to the Credit Agreement.[6] All three amendments included a "Consent and Reaffirmation," wherein Selkoe "reaffirm[ed] that all Loan Documents [including the Guaranty] shall continue to remain in full force and effect."[7]

2. Comvest alleges that Selkoe's obligation under the Guaranty to personally guarantee five million dollars of Karmaloop's debt was triggered when Comvest demanded payment, following Karmaloop's defaults in its performance obligations under the Credit Agreement. Selkoe alleges that his payment obligation was never triggered because Comvest failed to exhaust all commercially reasonable collection efforts against Karmaloop before demanding payment from Selkoe.

3. Selkoe also alleges various defenses and counterclaims against Comvest based on Comvest's wrongful conduct. In particular, Selkoe alleges that Comvest breached the implied covenant of good faith and fair dealing when Comvest made repeated misrepresentations to Selkoe as part of "an undisclosed plan to depress

---

[5] *Id.*; Defendant's Counterclaim ¶ 1 ("Countercl.") (Trans. ID. 57984046).
[6] Compl. Exs. B, C, D.
[7] Selkoe's Consent and Reaffirmation is Exhibit C to each of the amendments.

2

Karmaloop's value and interfere with its ability to repay its debt, so that Comvest could acquire [Karmaloop] for a fraction of its true worth."[8]

**Standard of Review**

4. A motion for judgment on the pleadings made pursuant to Superior Court Civil Rule 12(c) will be granted only when no material issues of fact exist and the movant is entitled to judgment as a matter of law.[9] On a motion to dismiss for failure to state a claim under Rule 12(b)(6), "all well-pleaded allegations must be accepted as true," and if the plaintiff can recover "under any reasonably conceivable set of circumstances susceptible of proof under the complaint," the motion to dismiss will be denied.[10] Under both Rule 12(b)(6) and Rule 12(c), if matters outside the pleadings are presented to and considered by the Court, the motion must be treated as one for summary judgment under Rule 56. In this case, the Guaranty is an Exhibit to the Complaint and is incorporated by reference in the Complaint; therefore the Guaranty is not outside the pleadings and may be considered in connection with Comvest's Motion.[11] Also, the findings of fact issued by the Bankruptcy Court in the Sale Order for Karmaloop's assets are appropriate to consider on a Rule 12 motion because they are part of an official

---

[8] Countercl. ¶¶ 1–70.
[9] *Artisans' Bank v. Seaford IR, LLC*, 2010 WL 2501471, at *1 (Del. Super. June 21, 2010) (citing *Gonzales v. Apartment Communities Corp.*, 2006 WL 2905724, at *1 (Del. Super. Oct. 4, 2006)).
[10] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).
[11] *Lagrone v. Am. Mortell Corp.*, 2008 WL 4152677, at *4 (Del. Super. Sept. 4, 2008) ("Matters attached to a complaint, and incorporated by reference, are not 'extraneous' for purposes of Rule 12.").

3

court record and subject to judicial notice.[12]  Therefore, Comvest's Motion need not be converted into a Rule 56 motion.

**Guaranty Trigger Provision**

5. Section 2.1(b) of the Guaranty states:

[I]n no event shall [Selkoe] be required to make payment to [Comvest] under Section 2(a) of this Guaranty until the earliest of

> (a) the date that [Comvest] has reasonably determined in good faith that [it] has exhausted, in all material respects, all commercially reasonably collection efforts available to [Comvest] against the Borrower [Karmaloop] and all material portions of the collateral,
>
> (b) 90 days after the occurrence of any Event of Default which was used as a basis for [Comvest] making a demand for payment under Section 2.1(a) or Section 2.7 of this Guaranty,
>
> (c) 90 days after the occurrence of an Event of Default under Section 7.01(f) of Section 7.01(g) of the Credit Agreement, and
>
> (d) 90 days after [Comvest] notifies [Selkoe] that [Comvest] has initiated its collection efforts against the Borrower and or/the Collateral.[13]

6. Comvest argues that this provision clearly and unambiguously allows for Comvest to demand payment once "the earliest of" subparts (a), (b), (c), or (d) is fulfilled.  Conversely, Selkoe argues that Section 2.1(b) subpart (a) is a freestanding requirement that Comvest exhaust commercially reasonably collection

---

[12] *Id.*

[13] Compl., Ex. E Amended and Restated Limited Personal Guaranty Agreement ("Guaranty"). Section 2.1(b) appears as a single continuous paragraph in the Guaranty.  Line breaks have been used here solely for clarity.

efforts against Karmaloop before Selkoe's obligation to pay can be triggered under subparts (b), (c), or (d). In particular, Selkoe highlights to the use of "and" between subparts (c) and (d). According to Selkoe, the use of "and" indicates that the subparts (a)–(d) are not four, equally sufficient, alternatives. Rather, Selkoe argues, the proper reading of Section 2.1(b) requires Comvest to exhaust commercially reasonable collections efforts against Karmaloop under subpart (a) *and* "the earliest of" subparts (c)–(d) must also be fulfilled before Selkoe's obligation to pay is triggered. At the least, Selkoe argues, the use of "and" between subparts (c) and (d) renders the provision ambiguous, such that dismissal of his counterclaim for breach of contract is not warranted.

7. Selkoe's interpretation does not comport with the plain meaning of Section 2.1(b).[14] Section 2.1(b) provides that Selkoe shall not have to pay "until the earliest of," with the phrase "until the earliest of" immediately followed by subparts (a)–(d). Although Selkoe's argument purports to make sense of the use of "and" rather than the disjunctive "or" between subparts (c) and (d), Selkoe's interpretation rearranges the text in a way unsupportable by the plain meaning of the provision. For Selkoe's interpretation to follow, Section 2.1(b) would read:

---

[14] *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)) ("The Court will interpret clear and unambiguous terms according to their ordinary meaning. 'Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.'").

In no event shall Selkoe be required to make payment to Comvest under Section 2(a) of this Guaranty until

> (a) Comvest has reasonably determined in good faith that it has exhausted, in all material respects, all commercially reasonably collection efforts available to Comvest against Karmaloop and all material portions of the collateral,
>
> *and, until the earliest of*
>
> (b) . . .
> (c) . . . *or*
> (d) . . . .

The provision is not fairly susceptible to this formulation.[15] Moreover, in this case, the use of "and" where an "or" might have been more appropriate does not render the provision ambiguous.[16] The plain meaning of Section 2.1(b) provides four alternative triggers, and Karmaloop filing for bankruptcy satisfies subpart (c). Therefore, Selkoe's counterclaim for breach of contract against Comvest for failing to fulfill subpart (a) before demanding payment is **DISMISSED.**

**Implied Covenant of Good Faith and Fair Dealing**

8. Under Delaware law, "a guarantor on a loan can assert the violation of the covenant of good faith that was implied in his personal guarantee as a defense

---

[15] *Id.* (quoting *Eagle Indus.*, 702 A.2d at 1232) ("[A]n ambiguity exists '[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.'").

[16] *Id.* (quoting *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.").

to a breach of contract claim."[17] Whether the implied covenant of good faith and fair dealing has been breached is a fact intensive inquiry, one not typically suitable for judgment on the pleadings.[18] That said, in *Daystar Construction Management, Inc. v. Mitchell*, the Court explained that it is exceptionally rare for the covenant to apply to a guarantee contract because "the ability to demand is an agreed upon term explicit in the contract," and the Court cannot dilute explicit terms of a contract by imposing implied obligations.[19]

9. In this case, it is not the demand of payment itself that Selkoe attacks, but Comvest's alleged intentional undermining of Karmaloop's operations such that Karmaloop could not fulfill its obligations under the Credit Agreement.[20] In *Daystar*, the Court laid out the inquiry that the Court must make in order to determine if a violation of the covenant of good faith and fair dealing can relieve a guarantor of their obligation to guarantee a debt:

---

[17] *Artisans' Bank*, 2010 WL 2501471, at *2 n.4 (citing *Daystar Construction Mgmt., Inc. v. Mitchell*, 2006 WL 2053649, at *7 (Del. Super. July 12, 2006)).

[18] *Daystar*, 2006 WL 2053649, at *8.

[19] *Id.* at *9 (citing *First Fed. Sav. Bank v. CPM Energy Sys.*, 1993 WL 138986, at *2 (Del. Super. Apr. 22, 1993)).

[20] *Id.* at *7 ("[T]o the extent the fact finder is to consider the plaintiff's non-compliance with the covenant as a basis to defeat the plaintiff's breach of contract claim, it is up to the defendant to raise the issue and then affirmatively prove the plaintiff's material breach, either in the context of a cross claim or, at least, an affirmative defense."); *see also Chamison v. HealthTrust-Hosp. Co.*, 735 A.2d 912, 920 (Del. Ch. 1999) ("This implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain.").

7

First, the Court must look to the operative agreement to determine if there is room to imply the covenant in the midst of the parties' express agreements and understandings. Second, the Court must take note of the nature of the contract at issue to determine how (or even if) the covenant fits under the circumstances. Third, the Court must look specifically at [the plaintiff's] conduct to determine if it rises to the level of a material breach of the covenant such that [the guarantor] may be relieved of his personal guarantee of the . . . debt.[21]

Considering step one of this analysis, Selkoe points to Section 2.1(b) of the Guaranty. Section 2.1(b) prohibits Comvest from demanding payment from Selkoe until Karmaloop proves unable to fulfill its obligations under the Credit Agreement. Thus, Selkoe argues, the implied covenant prohibits Comvest from intentionally interfering with Karmaloop's ability to repay the debt.

10. In opposition, Comvest highlights Sections 2.4(a) and 2.4(b) of the Guaranty. Section 2.4(a) provides that Selkoe's obligations are "primary, absolute and unconditional, irrespective of, and unaffected by . . . any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor." Section 2.4(b) provides that Selkoe's payment obligations "are not and shall not be subject to any counterclaims, offsets or defenses . . . whether now existing or which may arise in the future."[22] Comvest concludes that these provisions prohibit the application of the implied covenant in this case because Section 2.4(b) explicitly provides that the Guaranty is not subject

---

[21] *Id.* at *9.
[22] Emphasis added.

8

to counterclaims or defenses and because Sections 2.4(a) and 2.4(b) are contract terms that "address" the implied covenant, such that there is no room to imply any term in the Guaranty.

11. Selkoe counters that the Section 2.4(b) does not preclude a defense or counterclaim for breach of the implied covenant of good faith and fair dealing because Comvest's alleged misconduct occurred, for the most part, after the signing of the Guaranty. Thus, Selkoe argues that Section 2.4(b) does not bar the covenant's application in this case because an alleged waiver cannot be effective when the alleged wrongful conduct—intentional interference with another party's performance—occurred after the "waiver" was executed.[23]

12. Most of Comvest's alleged intentional interference with Karmaloop's ability to repay its debt occurred after the Guaranty was signed in June 2014, but before the amendments to the Credit Agreement were signed in March 2015. In the amendments to the Credit Agreement, Selkoe "absolutely, unconditionally and irrevocably" released "all actual or potential claims, demands or causes of action

---

[23] *See Bantum v. New Castle Cty. Vo-Tech Educ. Ass'n*, 21 A.3d 44, 50-51 (Del. 2011) (quoting *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) ("It is well settled in Delaware that a party may waive her rights. But, the standards for proving waiver under Delaware law are 'quite exacting.' 'Waiver is the voluntary and intentional relinquishment of a known right.' 'It implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those [ ] rights' . . . '[t]he facts relied upon to prove waiver must be unequivocal.' Applying those principles, we have required a party claiming waiver to show three elements: (1) that 'there is a requirement or condition to be waived,' (2) that 'the waiving party must know of the requirement or condition,' and (3) that 'the waiving party must intend to waive that requirement or condition.'") (footnotes omitted).

[against Comvest] . . . whether such Claims are matured or unmatured or known or unknown."[24] Selkoe does not dispute the validity of this release,[25] but maintains that his bad faith arguments, although articulated under the label "counterclaim," are purely defensive, and therefore, cannot be barred by a provision that says nothing about releasing defenses.

13. The release provision of the amendments to the Credit Agreement does not bar Selkoe from raising the implied covenant as a defense because the release provisions say nothing about releasing defenses, and a release must be unambiguous.[26] However, that does not end the inquiry. In connection with the amendments to the Credit Agreement, Selkoe also signed a "Consent and Reaffirmation" for each amendment. The Consent and Reaffirmations state that Selkoe "*reaffirms* that all Loan Documents [including the Guaranty] shall continue to remain in full force and effect." Thus, Comvest argues, Selkoe affirmed the enforceability of the Guaranty, including the waiver language in Section 2.4(b), as of March 19, 2015, when the last amendment to the Credit Agreement was signed.[27]

---

[24] Compl., Exs. B ¶ 5, C ¶ 4, D ¶ 4.
[25] *Tucker v. Albun, Inc.*, 1999 WL 1241073, at *2 (Del. Super. Sept. 27, 1999) ("A release is valid if it meets three requirements. First, the release must not be ambiguous. Second, the release must not be unconscionable. Finally, the release must not be against public policy.").
[26] *Daystar*, 2006 WL 2053649, at *6 ("[T]he covenant can be raised as a defense to a breach of contract claim in the civil context.").
[27] Compl. Ex. D.

14. Selkoe does not directly address the Consent and Reaffirmation in his answering brief. Rather, Selkoe's treatment of the Consent and Reaffirmation falls back to the issue of whether Section 2.4(b) precludes Selkoe's implied covenant claim. Selkoe argues that the Guaranty cannot bar his implied covenant defense because it does not "clearly and unequivocally" waive the implied covenant as a defense.[28] In particular, Selkoe highlights Section 2.5 of the Guaranty, wherein Selkoe "expressly waives" certain enumerated rights and defenses. The enumerated waiver provision of the Guaranty does not make the language of Section 2.4(b) ambiguous. Section 2.4(b) employs broad language: "The Guarantor represents, warrants, *and agrees* that its obligations under this Guaranty *are not and shall not* be subject to any counterclaims, offsets or *defenses . . . of any kind* against . . . [Comvest], whether now existing or which may arise in the future."[29] This language is clear and unequivocal, and as of March 19, 2015, when Selkoe signed the last of the amendments to the Credit Agreement, Selkoe affirmed that the Guaranty was in "full force and effect." Thus, Selkoe's argument that the implied covenant defense alleged in this case could not be waived by Section 2.4(b) because Comvest's misconduct had not yet occurred when the Guaranty was signed fails—Selkoe affirmed the enforceability of the Guaranty in March of 2015. For Selkoe to sustain a defense for breach of the implied covenant of good faith

---

[28] Selkoe Answer at 18.
[29] Emphasis added.

11

and fair dealing, the alleged wrongful conduct must *postdate* the signing of the third amendment to the Credit Agreement.[30]

**Collateral Estoppel**

15. The principle events that postdate the third amendment to the Guaranty are Karmaloop filing for bankruptcy and Comvest allegedly misrepresenting to Selkoe that he would continue to work for Karmaloop and that the Guaranty would be "resolved as part of [his] employment."[31] Comvest argues that Selkoe is collaterally estopped from arguing that Comvest acted in bad faith because such a theory is "directly contrary to the findings and final order of the bankruptcy court."[32]

16. The Bankruptcy Court found, *inter alia*, that Comvest "in no way induced or caused [Karmaloop's] chapter 11 filing."[33] Under Delaware law, the

---

[30] Comvest cites *First Federal Savings Bank v. CPM Energy Systems Corp.* as evidence that a prospective waiver of the type presented here would be enforceable. 1991 WL 35689 (Del. Super. Mar. 12, 1991). *CPM* is a bare-bones decision. Although the Court found that the defendants had waived their right to assert the counterclaims alleged in that case, the Court does not specify what the actual allegations of "bad faith" and misrepresentation were, nor is it clear when the alleged bad faith conduct occurred. *Id.* at *2–3.

[31] Countercl. ¶¶ 56–69.

[32] Comvest Mot. Dismiss at 16.

[33] Comvest Mot. Dismiss, Ex. 2 at 5. Selkoe also asserts that Comvest "intentionally structured the sale process to insure that it was the only bidder at the action" and "effectively foreclosed a true auction" for Karmaloop. Countercl. ¶¶ 50, 56. Comvest argues that these allegations conflict with the Bankruptcy Court's finding that the "bid procedures . . . were non-collusive and substantially and procedurally fair to all parties," that the "negotiation and execution" of Comvest's purchase of Karmaloop's assets "was in good faith and constituted an arms-length transaction between" Comvest and Karmaloop "without collusion and in good faith," and that the consideration paid by Comvest for Karmaloop's assets was "fair and reasonable." Comvest Mot. Dismiss at 17–18.

12

"preclusive effect of a foreign judgment is measured by standards of the rendering forum."[34] Because the Bankruptcy Court issued the relevant opinion, the law of the United States Court of Appeals for the Third Circuit applies.[35]

17. In the Third Circuit, a party is collaterally estopped when "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment."[36] The Third Circuit also requires that "the party against whom the doctrine is asserted must have been a party or in privity with a party to the prior adjudication and have had a full and fair opportunity to litigate the issue in question in the prior action."[37]

18. The record before the Court at this preliminary stage is insufficient for the Court to determine if Selkoe is collaterally estopped by the findings of the Bankruptcy Court. For example, Comvest states that Selkoe was a "creditor party" to the bankruptcy proceeding.[38] However, it is unclear at this stage whether Selkoe had a full and fair opportunity to litigate any of the factual findings issued by the

---

[34] *Acierno v. New Castle Cty.*, 679 A.2d 455, 459 (Del. 1996).

[35] *Yucaipa Am. All. Fund I, LP v. SBDRE LLC*, 2014 WL 5509787, at *11 (Del. Ch. Oct. 31, 2014) (citing *Acierno*, 679 A.2d at 459).

[36] *Id.* (quoting *In re Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992)) (alterations omitted); *see also Leyse v. Bank of Am., Nat'l Ass'n*, 538 Fed. App'x 156, 158–59 (3d Cir. 2013).

[37] *Seborowski v. Pittsburgh Press Co.*, 188 F.3d 163, 169 (3d Cir. 1999) (citing *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 548 (3d Cir. 1996)).

[38] Additionally, in its opening brief Comvest cites Delaware law on collateral estoppel, rather than the law of the Third Circuit.

Bankruptcy Court.[39] If Selkoe was not a party, whether Selkoe was in privity with Karmaloop is question of fact that cannot be determined at this stage.[40]

19. The collateral estoppel issue cannot be resolved on the record before the Court, and, because material issues of fact remain in dispute, judgment on the pleadings is inappropriate. Therefore, Comvest's Motion for Judgment on the Pleadings is **DENIED.**

**Bankruptcy Court Sale Order**

20. In its Reply brief, Comvest argues for the first time that Selkoe's defenses are barred by the Bankruptcy Court Sale Order because the "the rights that were transferred to Comvest by the Sale Order are 'good against the world.'"[41] In support of its two-sentence argument, Comvest cites *In re Farmland Industries,*

---

[39] *See In re Mariner Post-Acute Network, Inc.*, 267 B.R. 46, 53 (Bankr. D. Del. 2001) ("In considering the application of res judicata to bankruptcy proceedings, it is important to recognize the difference between bankruptcy cases and typical civil litigation. In the latter, identifying the parties and the cause of action is relatively easy to do: the parties are those named in the complaint who have been duly served and the issues are those articulated by the pleadings In contrast, in bankruptcy cases the parties in interest may include the debtor, all its creditors and all its shareholders. Additionally, a particular matter in a bankruptcy case may affect the debtor's employees, its vendors, its landlords, parties to contracts with the debtor, and numerous other parties. These parties are not typically named in the Motion or Application. Further the issues that may be litigated in the bankruptcy court are far reaching and include determinations of title to and liens on property, the sale of property, claims against the debtor and others related to the debtor, claims which the debtor may have against others, as well as numerous issues involving the debtor's operations and eventual business and financial restructuring. However, all of these issues (though the bankruptcy court may ultimately hear and decide them) are not expected to be litigated at one time. That is, the fact that a particular party may have an interest in a motion does not require that party to raise all interests or claims that it has in the bankruptcy case generally at the time that the motion is heard. However, this on its face is what res judicata appears to require. To apply res judicata so broadly would bring bankruptcy cases to a halt.").
[40] *Johnson & Johnson v. Coopervision, Inc.*, 720 F. Supp. 1116, 1123–24 (D. Del. 1989).
[41] Comvest Mot. Dismiss at 14 (citing *In re Farmland Indus., Inc.*, 376 B.R. 718, 727 (Bankr. W.D. Mo. 2007), *aff'd*, 408 B.R. 497 (B.A.P. 8th Cir. 2009)).

14

*Inc.*, a case in which the Bankruptcy Court for Western District of Missouri found that the unsuccessful bidder at an auction sale was collaterally estopped from bringing a claim of tortious interference against the successful bidder because the unsuccessful bidder was, in essence, "seeking to undo the economics of the sale."[42] In this case, Comvest's right to Karmaloop's assets is not at issue, and Selkoe's personal guarantee of a portion of Karmaloop's debt does not implicate the "economics of the sale" as contemplated by *Farmland*. Selkoe is not seeking to functionally oust Comvest as the purchaser of Karmaloop assets, but rather to be relieved of his obligations under the Guaranty.

**NOW THEREFORE**, for the foregoing reasons, Plaintiff's Motion to Dismiss is **GRANTED**, and Plaintiff's Motion for Judgment on the Pleadings is **DENIED**.

Jan R. Jurden, President Judge

---

[42] 376 B.R. at 726.